# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KISHA D. ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 7849 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Kisha Adams seeks review of the final decision of the Commissioner of the Social Security Administration, denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Ms. Adams asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming it.

## I.
### THE PROCEDURAL HISTORY OF THE CASE

Ms. Adams applied for Disability Insurance Benefits and Supplemental Security Income on July 8, 2008, alleging that she had been disabled since July 11, 2007. (Administrative Record ("R.") 51). Her claims were initially denied on September 15, 2008, and again, upon reconsideration, November 24, 2008. (R. 51). Ms. Adams then requested an administrative hearing. (R. 51). An Administrative Law Judge ("ALJ") presided over the hearing at which Ms. Adams, represented by counsel, appeared and testified. (R. 51). On October 29, 2009, the ALJ

issued a decision that denied Ms. Adams' claims. (R. 48). Ms. Adams then requested review by the Appeals Council, which was denied on October 29, 2010. (R. 1). Ms. Adams has appealed that decision to the federal district court under 42 U.S.C § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Ms. Adams was born on October 18, 1981, and was twenty-eight at the time of the decision by the ALJ. (R. 46). She lives with her four children, aged 8, 4, 3, and 1, for whom she is the sole caretaker. (R. 21). She has completed high school, and also received a certificate in the security field. (R. 22). Ms. Adams was laid off from her last position as a security guard in 2007, after her request to stand less often was denied. (R. 22-23). She has not worked since 2007. (R. 150).

### B.
### The Medical Evidence

In July 2008, Ms. Adams appeared for an examination related to a cough, and Anand Karsan, M.D., observed a normal range of motion in the extremities and no neurological symptoms. (R. 242). Later in July, Garrett Yam, M.D. examined Ms. Adams and observed muscle spasm of the lumbar spine as well as a positive straight leg raising test. (R. 237). A subsequent lumbar spine MRI revealed mild degenerative changes, causing a mild degree of canal stenosis with no significant foraminal stenosis. (R. 244). Shortly afterward, Ms. Adams participated in a Physical Work Performance Evaluation which showed that she is able to

perform physical work at the sedentary level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles ("DOT"). (R. 231). Ms. Adams' level of participation was noted as "reluctant" and "submaximal." (R. 231-33). The evaluation also notes that she did not see herself ever working again. It was suggested that Ms. Adams would benefit from vocational counseling. (R. 233).

In September 2008, Frank Jimenez, M.D. performed a Physical Residual Functional Capacity Assessment and evaluated Ms. Adams' limitations: occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; standing and/or walking, and sitting each for about six hours in an eight-hour work day; frequently climbing ramps, stairs, ladders, ropes, and scaffolds; frequently kneeling, crouching, and crawling; and occasionally stooping. (R. 273-80). Dr. Jimenez further noted that, in his judgment, Ms. Adams' symptoms were "disproportionate to medical evidence in file" and not wholly credible. (R. 278). Dr. Jimenez's assessment was later affirmed by state reviewing board physician Richard Bilinsky, M.D. in November 2008. (R. 285-87).

Ms. Adams also had a consultative mental status evaluation in September 2008, performed by Gregory Rudolph, Ph.D. (R 254-58). He noted that her mood level reflected some mild depression secondary to her medical condition. (R. 256). Ms. Adams also presented some vegetative symptoms. (R. 256). Dr. Rudolph observed that Ms. Adams was oriented to reality in all phases, her memory for recent as well as more distant events was intact, she had good knowledge of general information, and was able to perform arithmetical calculations, use good judgment, and use reasoning skills. (R. 254). It was also noted that Ms. Adams was able to take care of her basic needs, but experienced some limitations performing daily chores due to

physical limitations. (R. 254). Dr. Rudolph concluded that Ms. Adams is capable of managing her own financial resources and that her prognosis and insight were fair. (R. 254).

In that same month, state reviewing physician Howard Tin, Psy. D., found the following limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 269). Ms. Adams then underwent a Mental Residual Functional Capacity Assessment with Dr. Tin, in which he noted that she was moderately limited in abilities: the ability to understand, remember, and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 281). All other abilities – including abilities to understand, remember, and carry out short and simple instructions, to get along with coworkers and work in concert with them, and to complete a normal work-day and workweek without psychological interruptions – were found to be not significantly limited or not limited at all. (R. 281-84). In November 2008, these findings were affirmed by state agency reviewing physician Jerrold Heinrich, Ph.D. (R. 285-87).

In November 2008, Ms. Adams appeared at an appointment with Dr. Yam. (R. 299-303). During the examination, Dr. Yam noted that she had a coordinated and smooth gait, with hips and knees having a full range of motion and no muscle atrophy. (R. 301). Dr. Yam observed good strength in all extremities and intact sensation. (R. 301). In December 2008, the various treatment notes reflect diagnostic impressions including obesity, herniated disc with back pain, lumbar spondylosis, and snoring. (R. 312-15, 347-51, 357-70). During these appointments, Ms. Adams asked Dr. Yam to sign papers for an exemption from public housing community service

and for a disability parking placard. (R. 347-49). Dr. Yam refused to sign the disability parking placard because he did not see it necessary, given the Residual Functional Capacity Assessment performed in July. (R. 349). In addition, Dr. Yam refused to sign the papers for complete exemption from community service given the Residual Functional Capacity Assessment and because the papers did not note the type of work to be performed – he opined that Ms. Adams could perform clerical tasks or light duty. (R. 349). A form was completed stipulating that Ms. Adams should not do any heavy lifting over ten to fifteen pounds. (R. 349). Dr. Yam also observed that after he refused to sign the initial documents or prescribe narcotics, Ms. Adams became somewhat hostile. (R. 349). Dr. Yam noted the main issue seemed to be that she did not want to try and see if there was suitable light duty – similar to the submaximal effort noted in the Residual Functional Capacity Assessment. (R. 349).

Konstantin Slavin, M.D., examined Ms. Adams in late December and concluded that she has lumbar spondylosis and pain most likely related to spine problems, but that the symptoms and testing are not severe enough to justify surgery. (R. 363). Instead, Dr. Slavin recommended physical therapy, treatment in a pain clinic if the pain continues, and weight loss through increased activity. (R. 363-64).

In January 2009, Ms. Adams complained of depression on evaluation for physical therapy, and antidepressant therapy and psychiatric counseling were considered. (R. 346). In May 2009, Ms. Adams saw Nathan Bolden, M.D., and Leslie Jabine, M.D., complaining of a depressed mood and back pain. (R. 339-42). Specifically, she mentioned that she was always feeling tired, sleeping, having less interest in daily activities, low energy, unable to concentrate, and sporadic appetite without suicidal or homicidal thoughts. (R. 339). Ms. Adams explained

that she did not continue with previous physical therapy due to distance and claimed financial concerns, and that she would attempt to find a therapist closer to her home. (R. 340). Concerned that her depression might be contributing to her chronic pain symptoms and her non-compliance with previous medications, weight loss, and physical therapy, they prescribed anti-depressant medication. (R. 341-42). At that time, Ms. Adams was 5'6" and weighed 236 pounds. (R. 340).

## C.
### The Administrative Hearing Testimony

### 1.
### Ms. Adams' Testimony

Ms. Adams testified that she suffered from chronic back pain, which shot down her legs and arms and into her hands. (R. 24, 30). She said her pain had increased due to straining in her past employment and because she had gained weight. (R. 24). She testified that she takes pain medication, but that it makes her sleepy and only eases her pain. (R. 30). However, she later inconsistently stated that she does not experience any side effects from her current medication. (R. 32). She said that the pain affects her sleeping, causing her to toss and turn and wake up in the middle of the night. (R. 37-38). This causes her vision to be blurry as she wakes up and also results in drowsiness the next day. (R. 38). Due to her lack of sleep, she frequently takes naps during the day. (R. 38).

Ms. Adams also stated that due to her chronic pain she has trouble concentrating or focusing on things and has trouble following television shows or books. (R. 38-39). She said that she cooks meals for her family, cleans the dishes, does the laundry, bathes and dresses herself, shops for groceries, and does stretching exercises. (R. 34-36). Under further

questioning by her attorney, she testified that she often had to take breaks and pace herself through these tasks. (R. 37). She is the sole caretaker for her four children, with two at school for half the day, and one at school the whole day. (R. 32). She also said that she cleans the house with the help of her oldest daughter. (R. 34). Ms. Adams attends a two-hour Church service on Sundays, although sometimes she has to leave early. (R. 36). Sometimes she will take her children to the library or the beach. (R. 34).

When asked if she could walk three or four blocks without stopping, she could not answer with certainty, saying only that it depends. (R. 32). She testified she could only stand for fifteen to twenty minutes without leaning or resting, and can sit for thirty to forty minutes without adjusting or moving. (R. 33). She also testified that Dr. Bowden had told her not to sit down for more than fifteen minutes. (R. 24). Ms. Adams said she "can't pick up too much, maybe a sack of potatoes, or a…gallon of milk." (R. 33). She has crying spells almost every day. (R. 31). Ms. Adams also testified that due to her pain, "I ain't going to be able to work no more." (R. 25). Ms. Adams stated that she has trouble getting along or trusting people, and that she spends a lot of time in the house. (R. 31).

When asked why she did not follow up for therapy after being evaluated, Ms. Adams replied that due to babysitting, transportation, and money she is unable to go to the therapist. (R. 26). She claimed that she did not attend the new therapy prescription closer to her home because no one responded when she followed up with a phone call. (R. 26). She testified that she has not seen an orthopedist or a neurosurgeon for her back, and that no one has recommended surgery for her back. (R. 26). Ms. Adams stated that she is currently taking Amitriptyline, as her previous prescription of Tramadol was not strong enough. (R. 27). Under questioning about

why she has not pursued any mental health treatment in the form of a psychiatrist, counselor, or therapist, she replied that it was not offered and that she has not looked into such services. (R. 27). Ms. Adams also testified that she has been encouraged to lose weight and has lost ten pounds through changes in her diet. (R. 27). When asked if felt any improvement, she replied that she has more energy but her back pain is "the same." (R. 27-28). Although her doctors also recommended walking to improve her back symptoms, she testified that she does not because it is too hard to walk far and that she would need a babysitter for her children. (R. 36-37).

## 2.
### The Vocational Expert's Testimony

Mr. Johnston then testified as a vocational expert. In response to the ALJ's hypothetical, he testified that a person who is twenty-seven years old, has the work experience and education of Ms. Adams, could sit for six to eight hours a day, could stand and walk at least six hours out of a day, could lift and carry frequently up to ten pounds and occasionally twenty pounds, could occasionally stoop, and was limited to unskilled jobs could not perform claimant's past work. (R. 41). However, Mr. Johnston was able to identify 27,000 jobs in the Chicago Metropolitan area that such a hypothetical person would be able to perform including surveillance system monitor (5,000), assembler (19,000), and parts inspector/tester (3,000). (R. 41). The ALJ then asked whether those jobs would exist if the hypothetical person were limited to sedentary work, could lift and carry no more than ten pounds, and could stand and walk no more than two hours out of the day. (R. 41). Mr. Johnston replied that the person could still perform all of the surveillance monitoring positions (5,000), some of the assembly jobs (4,000), some of the parts inspection jobs (2,000), and some of the sorting positions (2,000). (R. 42)

Ms. Adams' attorney then asked Mr. Johnston if being absent on average two days per week due to flare-ups in back pain would prevent an individual's ability to sustain work, which Mr. Johnston answered in the affirmative. (R. 42). Ms. Adams' attorney also asked if an individual's ability to work would be affected if instead of the opportunity to sit and stand every forty-five minutes, the individual was required to take a break every forty-five minutes to an hour. (R. 42). Mr. Johnston said that such a restriction would affect an individual's ability to work and would eliminate jobs. (R. 42). Finally, Ms. Adams' attorney asked if an individual's ability to work would be affected if the individual were off task twenty percent of the day due to impairments in their attention and concentration from back pain, and Mr. Johnston replied that twenty percent is the "threshold number" over which the ability to work would be affected. (R. 42).

### D.
### The ALJ's Decision

The ALJ found that Ms. Adams has the following *severe* impairments: lumbar spinal degenerative disc disease and spondylosis; obesity; and depression. (R. 53). She noted that these impairments cause limitations in her ability to perform basic work activities. (R. 53). The ALJ also found that Ms. Adams' mental impairments did not meet or equal any of the listed impairments, including Listings 1.00B.2, 1.04, and 12.04. (R. 54).

The ALJ found that Ms. Adams has *mild* restrictions in terms of daily living, *mild* difficulties in social functioning, and *moderate* difficulties in terms of concentration, persistence or pace. (R. 54). There were no extended periods of decompensation. (R. 54). In terms of daily living, the ALJ noted that she enjoys reading and watching television and movies, she is able to

handle money, shop, perform household chores, prepare meals, is able to use public transportation, visit shopping malls, attend a two-hour church service weekly, and occasionally go on outings with her children to the library or beach. (R. 54). For social functioning, the ALJ observed that she gets along with and visits her family and that she "loves to talk to people". (R. 54). The ALJ noted the *moderate* difficulties with concentration, persistence or pace are based on testimony that Ms. Adams can pay attention for thirty to thirty-five minutes and that her concentration is adequate, but also took note of Dr. Rudolph's mental status evaluation in September 2008 which was entirely normal. (R. 54).

Next, after examining the medical evidence and discussing the testimony at Ms. Adams' hearing, the ALJ determined that Ms. Adams could perform light, unskilled work except that she cannot stoop more than occasionally. (R. 55). The ALJ held that Ms. Adams' medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. (R. 56). The ALJ continued, finding that Ms. Adams was not credible regarding the extent of her claimed symptoms and then proceeded to explain her determination. (R. 56). The ALJ looked at the medical history of Ms. Adams, her past statements, and her daily activities, and found that the claimed limitations were not supported by the record as a whole. (R. 56-57). Ms. Adams' doctors repeatedly recommended physical therapy and activity, declined to sign waivers testifying to her inability to perform work, and did not consider surgery. (R. 56-57). The ALJ also noted Ms. Adams' daily activities, her past statements about never working again, and her submaximal effort on the Functional Capabilities Evaluation. (R. 56-57).

The ALJ found that Ms. Adams was unable to perform any past relevant work. (R. 57). The ALJ, relying on the Vocational Expert, then determinted that Ms. Adams could perform

some jobs which exist in significant numbers in the national economy. (R. 57). Specifically, the ALJ found that she was able to perform as a surveillance system monitor (5,000 jobs), assembler (19,000 jobs), and parts inspector/tester (3,000 jobs). (R. 57-58). Based on this finding, the ALJ concluded that Ms. Adams was not disabled under the framework of the Social Security Act. (R. 58).

## III.
## ANALYSIS

### A.
### The Standard of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d. 503, 513-14 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

That court may not reweigh evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513-14; *Binion v. Chater*, 108 F.3d 833, 841 (7th Cir. 2007). While the standard of review is deferential, the court cannot

11

"rubber stamp" the Commissioner's decision.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit his or her decision to only that evidence that supports the ultimate conclusion.  *Herron v. Shalala*, 19 F.3d. 329, 333 (7th Cir. 1994).  The ALJ's decision must allow the court to assess the validity of the findings and afford the claimant a meaningful judicial review.  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009).  The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion.  *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).  It is a "lax" standard. *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008); *Berger*, 516 F.3d at 545.

The suggestion that one sees often in briefs in social security cases that the logical bridge requirement requires some extended and elaborate analysis is mistaken.  It is enough if the ALJ "minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability."  *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Indeed, *Sarchet*, itself, relied on *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994), which held: "[w]e have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence." *Id*. at 333.  That requirement is satisfied here.

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;
2) does the plaintiff have a severe impairment;
3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
4) is the plaintiff unable to perform his past relevant work; and
5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

**C.**

**Ms. Adam's Objections to the ALJ's Decision**

Ms. Adams first argues that the ALJ failed to make a proper credibility determination under SSR-96-7p because the ALJ made conclusory statements regarding the symptoms that she testified to, that the ALJ only summarized evidence, and that the ALJ failed to provide

meaningful analysis.  Ms. Adams also alleges that the ALJ failed to address mental impairments on her perception of pain and her complaints of fatigue.

Ms. Adams also contests the sufficiency of the RFC assessment as a matter of law, alleging that the ALJ had no medical basis for her determination, that the ALJ failed to explain how she arrived at the RFC, and that the ALJ failed to account for Ms. Adams' moderate limitations with concentration, persistence, or pace in her RFC assessment.  Ms. Adams argues that the ALJ failed in her responsibility to build a "logical bridge" between the evidence and the eventual RFC assessment.

Finally, Ms. Adams claims that the ALJ failed to analyze Ms. Adams' obesity in combination with her other impairments, arguing that her obesity exacerbates the existing back problems.  She states that the ALJ erred in failing to provide an explanation of the effect of obesity on her limitations and on her RFC.  Ms. Adams also notes that consideration of her obesity would have further enhanced her credibility.

### 1.
### The ALJ's Adverse Credibility Determination

### a.

The plaintiff's objections to the ALJ's credibility determination overlooks the basic principle that "of course, the Administrative law judge did not have to believe" Ms. Adams. *Sarchet,* 78 F.3d at 307. *Accord Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006). Social Security hearings are not exempt from the basic axiom of experience that parties and witnesses will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87

F.3d 963, 965–66 (8th Cir.1996). Thus, the administrative law judge was not bound to credit plaintiff's complaints insofar as they clashed with other, objective medical evidence in the record or her credibility was otherwise called into question by appropriate evidence, *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir.2007), including discrepancies between objective medical or other evidence, including self-reports, which may be evidence of symptom exaggeration. *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir.2008); *Sienkiewicz,* 409 F.3d at 804.

But, making judgments about who is telling the truth can be a tricky business. A reviewing court lacks direct access to the witnesses, lacks the trier of fact's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting)("a few minutes observation of the parties in the courtroom is more informing than reams of cold record."). That is why credibility determinations by the ALJ are entitled to "special deference." *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.2010); *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir.2005); *Jones v. Astrue,* 623 F.3d 1155,1160 (7th Cir.2010); *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir.2008).

Only when the ALJ's determination is "patently wrong" can it be reversed. *Jones,* 623 F.3d at 1162. This principle is equally applicable to credibility determination involving claimed pain. *Molnar v. Astrue,* 395 Fed.Appx. 282, 288 (7th Cir. 2010); *Castile v. Astrue,* 617 F .3d 923, 929 (7th Cir.2010).

An ALJ's credibility determination need not be flawless. *Simila,* 573 F.3d at 517. Only when it is "lack[ing] any explanation or support," will it be deemed "patently wrong. *Jones,* 623 F .3d at 1160–62; *Simila,* 573 F.3d at 517; *Elder,* 529 F.3d. at 413–14; *Allord v. Barnhart,* 455

F.3d 818, 821 (7th Cir.2006); *Berger,* 516 F.3d at 546. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587 (7th Cir.2010).

In making judgments about the veracity of a claimant's statements about his or her symptoms, the ALJ, in addition to considering the objective medical evidence, should consider the following in totality: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) *any other factors* concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(Emphasis supplied).

Inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements "*and the rest of the evidence*" are of course significant. 20 C.F.R. §§ 404.1529(c)(4)(Emphasis supplied). *Compare Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir.2007) ("'factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it.'").

Failure to adhere to these fundamental principles of judicial review would effectively shift the center of authority from the ALJ to the courts and impermissibly realign the different

roles and responsibilities that Congress has allocated to the Social Security Administration and the judiciary.

### b.

Ms. Adams first contends that, contrary to the prohibition against conclusory credibility determinations, *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003), the ALJ did not more than state in a conclusory fashion that Ms. Adams' statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. (*Memorandum in Support of Plaintiff's Motion*, at 5). In *Brindisi*, the ALJ's credibility determination was deficient because he "[did] not explain the weight given to the [claimant's] statements and [did] not support his determination with any evidence in the record." The Seventh Circuit found it had "turn[ed] the credibility determination process on its head." 315 F.3d at 788.

*Brindisi* and the district court cases cited by Ms. Adams establish the unexceptional principle that an ALJ cannot simply *state* the outcome of the credibility assessment, but must explain the various factors and evidence that support the ultimate conclusion. That is precisely what the ALJ did in concluding that Ms. Adams' claimed degree of limitation was not credible. (R. 56-57). She did not merely conclude that the claimant's symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment. The Seventh Circuit has repeatedly criticized this template as "unhelpful," *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir.2012), "opaque," *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012), and "meaningless." *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010). It has explained that it backwardly "implies that the ability to work is determined first and is then used to determine the

claimant's credibility." *Bjornson,* 671 F.3d at 645–46. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue,* 628 F.3d 346 (7th Cir.2010); *Parker,* 597 F.3d 920.

While this sort of boilerplate is inadequate, *by itself,* to support a credibility finding, *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir. 2012), its use, does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011); *Parker,* 597 F.3d at 921–22. Where, as here, the ALJ's decision does not use the language in a mechanical fashion, and the ALJ carefully explains how the plaintiff's claimed limitations are "not supported by the record as a whole," (R. 56-57), reversal is not warranted.

Here, the ALJ reviewed Ms. Adams' complaints, including back, hand, and lower extremity pain, drowsiness due to medication, breaks during household tasks, naps, depression, crying spells, focusing issues, and ability to walk, lift, and sit. (R. 55-56). Then, she compared these claimed symptoms with the medical evidence in the record. (R. 56). The ALJ noted that Ms. Adams underwent a functional capacities evaluation in July 2008 in which she exerted submaximal effort and stated that she did not see herself working again. (R. 56). A magnetic resonance imaging (MRI) of the lower back showed mild degenerative disk disease, diffuse disc bulging, and mild canal stenosis. (R. 56). It was determined in November 2008 that the musculosketal exam was unremarkable and, other than possible decreased lower left extremity strength, she was neurologically fit. In December 2008, she demonstrated normal strength and sensation, minimal decreased grip strength, and was diagnosed with lumbar spondylosis. (R. 56).

The ALJ noted that surgery was not recommended; instead she was advised to undergo physical therapy, increase the level of activity, and lose weight. (R. 56). The ALJ also noted that although Ms. Adams asked her physician for an exception to community service and for a disabled parking permit, he refused due to her functional she was denied due to her functional capacities evaluation and the physician's opinion regarding her capabilities. (R. 56). The treatment notes by Ms. Adams' doctors do not support the limitations claimed. The ALJ thus determined that Ms. Adams' claimed symptoms are not supported by the record. Although an ALJ may not ignore a claimant's complaints solely on the basis of conflicting medical evidence, "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ also carefully compared Ms. Adams' claimed symptoms to her treatments and daily activities. The ALJ noted that physical therapy was recommended, but Ms. Adams did not begin treatment citing time and financial constraints. (R. 57). Although she had been given contact information for a therapist closer to her home, she claimed that no one had returned her call. (R. 57). The ALJ was not required to believe this assertion in light of the entirety of the evidence.

Ms. Adams testified that she is on anti-depressants, but has "sought no formal mental health treatment." (R. 56). The ALJ observed that she cares for her four children independently, and that she enjoys reading and watching television and movies, is able to shop, perform household chores, prepare meals, use public transportation, attend a weekly two hour church service and occasionally take her children to the beach or library. (R. 54, 57). These daily activities, while not conclusive, were properly considered as factors in determining the extent of

19

Ms. Adams' claimed symptoms. 20 C.F.R. § 404.1529(c)(3)(i) (explaining that other evidence, including daily activities, is an "important indicator of the intensity and persistence of [claimant's] symptoms.").

Ms. Adams also testified that Dr. Bowden at the University of Illinois Medical Center advised her not to sit for more than fifteen minutes. However, that claim is not supported by any treatment notes in the record. (R. 57). The ALJ did not consider these incidents in a vacuum, but instead looked to the record "as a whole" to provide proper context in establishing the credibility of Ms. Adams. (R. 57).

At bottom, Ms. Adams' real complaint is that she was telling the truth and the ALJ was bound to accept what she said and by not doing so, his credibility determination is necessarily flawed. Of course, it was for the ALJ to determine whether Ms. Adams' testimony was credible, not to begin with the *a priori* assumption it was.

Ms. Adams also asserts that the ALJ's decision was inadequate because it did not properly analyze her complaints of fatigue. (*Memorandum in Support of Plaintiff's Motion*, at 6-7). Reliance is placed on *Mulligan v. Astrue*, 336 Fed. Appx. 571, 576 (7th Cir. 2009) for the proposition that failure to perform analysis of fatigue requires remand. (*Memorandum in Support of Plaintiff's Motion*, at 6-7). *Mulligan* is readily distinguishable because the ALJ there favored a non-reviewing state-agency physician over a treating physician without good reason. That did not occur here.

Ms. Adams also cites *Porch v. Chater* and *Holland v. Barnhart* for the same proposition. (*Memorandum in Support of Plaintiff's Motion*, at 7). *Porch* dealt with fatigue in the context of questions to the Vocational Expert for jobs in the national economy and did not refer to the

credibility assessment of the ALJ, as is the case here. *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997). *Holland* falls into this category as well, reversing an ALJ's finding of no disability inconsistent with complaints of fatigue, *not* for a flawed credibility assessment. *Holland v. Barnhart*, 2003 WL 22078383, at *9 (N.D. Ill. 2003).

Here, the ALJ did not have a split of medical authority, but examined the record as a whole and carefully considered Ms. Adams' complaints in the context of that evidence. (R. 55-56). The ALJ recognized Ms. Adams' complaints that her medicine causes drowsiness, her estimation that she stand for fifteen to twenty minutes, sit for thirty minutes, lift eight pounds, and walk three blocks, and that she naps for three hours daily. (R. 55). She then proceeded to assess their validity as she was obligated to do. The ALJ looked to medical reports, including a denial of a disabled parking placard – something that Dr. Yam did not think was necessary, (R. 57), to plaintiff's her admitted daily activities around the house and her previous unsupported statements regarding Dr. Bowden. (R. 57). In this case, it cannot be said that the plaintiff's claims of fatigue was so lacking as to require reversal.

Ms. Adams cites *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004) for the proposition that the ALJ should have considered whether the claimant experienced exacerbated pain due to her mental impairment. (*Memorandum in Support of Plaintiff's Motion*, at 7). In *Carradine*, the record showed that the claimant had been diagnosed with a somatoform disorder – in effect "physical distress of psychological origin." *Id.* at 754. The Seventh Circuit reversed the ALJ's finding because the ALJ stated that the somatoform disorder diagnosis meant that the claimant exaggerated her symptoms. *Id.* The Court of Appeals held that the ALJ did not understand that the disorder results in real pain, only from a mental source instead of a physical source. *Id.*

Here, there is no such diagnosis. The ALJ noted that Ms. Adams had been diagnosed with mild depression, was prescribed antidepressant medication, and had not sought formal mental health treatment. (R. 56). Although Ms. Adams' doctor was concerned that her depression might be contributing to her pain and noncompliance with treatment, this is not a diagnosis of a somatoform or similar disorder, and the ALJ's overall assessment took account of all of the factors about which Ms. Adams complained. Ms. Adams also cites *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), but that case is not comparable to this. Moreover, it dealt with an assessment of an applicant's ability to work, not with a credibility determination.

Ms. Adams also argues that her obesity should have been considered as a factor in assessing her credibility. (*Memorandum in Support of Plaintiff's Motion*, at 15). Although an ALJ need not mention every sliver of evidence, neither can she ignore evidence that conflicts with her ultimate conclusion. *Herron*, 19 F.3d at 333. As the Commissioner notes, the ALJ considered obesity as a severe impairment. (R. 53). The ALJ then went on to discuss the December 2008 treatment notes which discuss obesity but also reflect recommendations by Ms. Adams' doctors to undergo physical therapy and increase her level of activity. (R. 56, 312-15, 347-51, 357-70). In addition, the ALJ noted that Dr. Yam refused to recommend a disabled parking sticker and exemption from community service for Ms. Adams. (R. 56, 349). Thus, her own doctors – aware of her obesity and other claimed symptoms – disagreed with her claimed limitations and instead recommended increased activity. The ALJ therefore properly considered Ms. Adams' obesity in the analysis.

Contrary to Ms. Adams' allegations, the ALJ properly determined Ms. Adams' credibility by looking at the entire record and making a credibility determination based on the

entirety of the evidence. The ALJ found Ms. Adams' claimed limitations inconsistent with the medical evidence, her doctors' opinions, her daily activities, and her own prior statements. That the credibility determination did not lack "any explanation or support," and was not "patently wrong." Consequently, it ought not be disturbed. *Elder*, 529 F.3d. at 413-14.

## 2.

### Sufficiency of the Residual Functional Capacity Assessment

Ms. Adams next questions the sufficiency of the Residual Functional Capacity Assessment as a matter of law, alleging that the ALJ had no medical basis for her determination, that she failed to explain how she arrived at the RFC, and that she failed to account for Ms. Adams' moderate limitations with concentration, persistence, or pace in her RFC assessment. (*Memorandum in Support of Plaintiff's Motion*, at 8-14). Ms. Adams insists that the ALJ failed in her responsibility to build a "logical bridge" between the evidence and the eventual RFC assessment. (*Memorandum in Support of Plaintiff's Motion*, at 8-14). The Commissioner disagrees. (*Defendant's Response to Plaintiff's Motion*, at 6-10).

Ms. Adams also argues that the ALJ's RFC determination had no medical basis for support, (*Memorandum in Support of Plaintiff's Motion*, at 8), and that the ALJ therefore did not sufficiently explain how the RFC assessment was determined. (*Memorandum in Support of Plaintiff's Motion*, at 9). These argument are meritorious.

The RFC assessment is a consideration of the things a claimant can physically accomplish in order to determine what types of work can be performed. 20 C.F.R. § 404.1545(a)(1); *Berger*, 516 F.3d at 544. As previously mentioned, when a reviewing court

examines the ALJ's RFC determination, it is not to reweigh the evidence or substitute the ALJ's analysis with its own. *Id.*; *Terry*, 580 F.3d at 475. If there is substantial evidence to support that decision, the court must affirm the decision of the ALJ. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). "Substantial evidence" need not be a preponderance, but it must be more than a mere scintilla. *Id.* at 841-42. An ALJ need not elaborate in intricate detail the evaluation of every item in the record, but only allow a reviewing court to "trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996).

In terms of physical impairments, the ALJ stated that she gave the July 2008 report from Ms. Adams' doctors little weight because Ms. Adams was observed exerting submaximal effort and averred that she didn't think she would be working anymore. (R. 57). The ALJ specified that she gave weight to the Functional Capacity Assessment's limitation of sedentary work only as far as it supported non-disabling limitations. (R. 57). She went on to note that the "rest of the medical evidence fails to support a restriction to less than light work." (R. 57). The ALJ noted that Dr. Yam refused to sign paperwork exempting Ms. Adams from community service, because of the previous functional capabilities exam and his opinion that Ms. Adams could perform some sedentary work. (R. 56). But as Ms. Adams points out, the ALJ does not explain why she considers Ms. Adams able to perform light work, with occasional stooping. The proceeding lacked a medical expert and the ALJ neglected to mention any of the social security reviewing physicians who specifically evaluated her work limitations. Despite this, the ALJ found that Ms. Adams was capable of "light work". (R. 55-57).

In terms of mental condition, the ALJ mentioned Dr. Rudolph's psychological evaluation in September 2008, in which he diagnosed "mild depression" but noted intact memory, judgment

24

and reasoning skills, and a good knowledge of general information. (R. 56). The ALJ noted the exam in May 2009, when Ms. Adams was prescribed anti-depressant medication, the initial complaint of depression in January 2008, and the testimony at the hearing in which Ms. Adams stated she has sought no formal mental health treatment. (R. 56). None of these citations directly evaluate the limitations of Ms. Adams in her ability to perform work. Again, the ALJ failed to mention the social security reviewing psychologists, yet determined that Ms. Adams was capable of "unskilled work". (R. 55-57).

In response, the Commissioner makes an attempt to introduce the opinions of Drs. Jimenez and Bilinsky, Tin, and Heinrich in support of the ALJ's determination. (*Defendant's Response to Plaintiff's Motion*, at 8-9). As the Commissioner notes, the opinions of those social security reviewing doctors support the ALJ's RFC assessment. (*Defendant's Response to Plaintiff's Motion*, at 8-9). However, as Ms. Adams correctly notes, the problem is that the ALJ never mentioned these doctors or their evaluations at any point during the determination. (*Plaintiff's Reply to Defendant's Response*, at 9). That omission is critical here as it was in *Parker v. Astrue*, where the Seventh Circuit refused to allow the Commissioner to buttress the decision of the ALJ with medical opinions that the ALJ "did not see fit even to mention." 597 F.3d 920, 922 (7th Cir. 2010). Because the ALJ did not bring these medical opinions into the record in her RFC determination of Ms. Adams, they cannot now be brought in by the Commissioner. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (noting that the "principles of administrative law" require a reviewing court to look only at reasons supplied by the ALJ for its decision – even if the record as a whole would support the decision).

In many cases such a failure would require a remand back to the ALJ to clarify the medical basis for the RFC assessment, but not here. The same "principles of administrative law" that Ms. Adams cites do not require a remand if the administrative agency would reinstate the same decision. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Fisher v. Brown*, 869 F.2d 1055, 1057 (7th Cir. 1989); *Illinois v. ICC*, 722 F.2d 1341, 1348-49 (7th Cir. 1983). As *Fisher* noted earlier, "unless there is some reason to believe that the remand would lead to a different result" the decision should not be disturbed. *Fisher*, 869 F.2d at 1057. Indeed, a remand when there is "great confidence" that the agency will reinstate its position due to a failure to specifically enumerate the overwhelming support in the record would be "a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Here, there is no reason to believe that a remand would lead to a different result for Ms. Adams. A remand would result only in the ALJ citing the opinions of the Social Security examining doctors, which are entirely consistent with the ALJ's determination of light work with occasional stooping. Drs. Jimenez and Bilinsky found Ms. Adams had the following limitations: occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; standing and/or walking, and sitting each for about six hours in an eight hour work day; frequently climbing ramps, stairs, ladders, ropes, and scaffolds; frequently kneeling, crouching, and crawling; and occasionally stooping. (R. 273-80). This is precisely the definition of "light work" as defined by *SSR 83-10*. To be clear, this is not a case where the ALJ failed to mention medical evidence helpful to the claimant's case. It is the reverse – the ALJ neglected to mention medical evidence that is contrary to the claimant's case. Although the ALJ erred by not

mentioning these medical opinions, it is clear that this error alone was "harmless" because the RFC determination would be the same had the error not been committed.

Ms. Adams also alleges that the ALJ failed to account for Ms. Adams' moderate limitations with concentration, persistence, or pace in the RFC assessment.  In support of her claim Ms. Adams heavily relies on *Craft v. Astrue*.  (*Memorandum in Support of Plaintiff's Motion*, at 12),  which she reads as standing for the proposition that a limitation to unskilled work in lieu of moderate restrictions in concentration, persistence, or pace has been categorically rejected. (*Memorandum in Support of Plaintiff's Motion*, at 12).  In fact, *Craft* goes on to note that "[t]he Social Security Administration has stated that where the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then a RFC of 'unskilled' work would be appropriate."  *Craft*, 539 F.3d at 677 (citing *SSR 85-15*). *Craft* was remanded because the ALJ failed to build the "logical bridge" between the citation of evidence and the decision to use the "unskilled" label to account for mental limitations.  *Id*. at 677.

Here, similar to *Craft*, Ms. Adams' case would normally be remanded for further explanation, as the ALJ did not explain the basis for her RFC determination of "unskilled."  It is noteworthy that Drs. Tin and Heinrich, which the ALJ did not mention, specifically opined that Ms. Adams was not significantly limited or not limited at all in her abilities to: understand, remember, and carry out short and simple instructions, to get along with coworkers and work in concert with them, and to complete a normal work-day and workweek without psychological interruptions.  (R. 281-84).  This is almost exactly what the Seventh Circuit stated is a sound

basis for a RFC of "unskilled work" in *Craft*. 539 F.3d at 677. Thus, a remand would usually be necessary in order to establish the "logical bridge" between the evidence and the decision. However, in the same vein as the discussion regarding light work, a remand for this reason alone would be futile as the ALJ would likely come to the same RFC determination through explicit mention of Drs. Tin and Heinrich. Had Ms. Adams pointed to a medical opinion that supported her claim yet was improperly ignored, a remand on this issue alone would be required. Yet the ALJ ignored no medical opinion that would support the claimant's case and contradict the RFC.

### 3.

### Hypothetical to Vocational Expert

Finally, Ms. Adams also questions the validity of the questions to the vocational expert ("VE"), as the ALJ does not mention any "limitations in concentration, persistence or pace," and instead simply limited the questions to "unskilled" work. (*Memorandum in Support of Plaintiff's Motion*, at 13-14). *O'Connor-Spinner v. Astrue*, which both the Commissioner and Ms. Adams cite, holds that an ALJ must "orient the VE to the totality of a claimant's limitations," *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010), so that the VE can determine what jobs in the national economy the claimant may perform. *Id*. at 621. The Seventh Circuit has acknowledged the "uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." *Kusilek v. Barnhart*, 175 Fed. Appx. 68, 71 (7th Cir. 2006). The general rule is that the ALJ must alert the VE to all the limitations of the claimant, but there is no literal requirement that the terms "concentration, persistence or pace" be used. *O'Connor*, 627 F.3d at 619-20. *See also Martinez v. Astrue*, 2010 WL 1292491, at *12 (N.D. Ill. 2010) (rejecting plaintiff's contention that an ALJ may never use the terms

28

"unskilled, simple, repetitive, [or] routine" in forming hypothetical questions to the vocational expert).

For instance, a VE's knowledge about the claimant's mental limitations will be assumed if the record reflects that the VE independently reviewed the medical record or heard direct testimony about those limitations. *O'Connor*, 627 F.3d at 619. However this exception did not apply to cases where the ALJ asked increasingly restrictive questions, since it is inferred that the focus would be on the hypotheticals and not the record. *Id.* In addition, a mention of all limitations is not necessary when it is obvious that the ALJ's "alternative phrasing" would specifically exclude the activities that a person with the limitations could not perform or if the ALJ mentioned the underlying conditions behind the limitations. *Id.* Lastly, if a medical expert "translated an opinion of the claimant's medical limitations into an RFC assessment" an ALJ may rely upon that translation in questioning the VE. *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010). *See also Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (finding no error when an ALJ relied on a medical translation to convey limitations in concentration, persistence, and pace to the vocational expert instead of specifically asking about those limitations).

In the present case, none of these exceptions apply, and the ALJ erred by failing to alert the VE to all of Ms. Adams' limitations of concentration, persistence or pace. Although the VE was present at the hearing, it is unclear whether he had a chance to independently review Ms. Adams' medical record. The ALJ asked him if he had "an opportunity to review the record made available to you regarding the claimant's vocational history." (R. 39). The ALJ also asked if the VE had "heard all the testimony regarding her work history." (R. 39). The record is left

blank as to whether the VE was aware of the mental limitations of Ms. Adams and so the first exception cannot apply. The Commissioner's argument regarding the "alternative phrasing" exception does not apply either. The ALJ did not make it obvious that "unskilled work" would exclude activities that Ms. Adams could not perform or mention Ms. Adams' underlying conditions. The Commissioner's best argument lies in the exception of a "translation" from a medical expert. However this contention also falls short, as the ALJ never mentioned the opinions of Drs. Tin and Heinrich (who did provide such a translation) and there are no medical opinions cited that would translate to "unskilled work." Since there are no applicable exceptions, the ALJ has failed to alert the VE to the totality of limitations that Ms. Adams experiences.

It cannot be said that the error was harmless as the VE depended on the ALJ to frame the claimant's limitations in order to supply the work that could be performed. Due to this failure, it is unclear if the VE properly identified jobs that Ms. Adams could perform. Because it cannot be ascertained whether the VE's testimony represents substantial evidence, a remand is required. *See O'Connor-Spinner*, 627 F.3d at 620-21 (remanding where the hypothetical did not fully address the limitations of the claimant and thus could not "assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do"); See *also Young v. Barnhart*, 362 F.3d 995, 1004-05 (holding that when a hypothetical question to the VE is "fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand").

**4.**

**Analysis of Obesity**

Ms. Adams contends that in addition, the ALJ failed to analyze her obesity in combination with other "impairments" and its effect on her ability to perform work. (*Memorandum in Support of Plaintiff's Motion*, at 15). Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work. This point is obscured by the tendency in some cases – and most briefs of social security claimants – to describe obesity as an impairment, limitation, or disability. *Sienkiewicz v. Barnhart,* 409 F.3d 798, 803 (7th Cir.2005) (per curiam). It is, as Judge Posner has pointed out, none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal efficacy is determined, it drops out of the picture. If the claimant for social security disability benefits is so obese as to be unable to bend, the issue is the effect of that inability on the claimant's capacity for work. *Gentle v. Barnhart,* 430 F.3d 865, 868 (7th Cir. 2005).

As the Commissioner points out, the ALJ specifically discussed the December 2008 treatment notes, which include a diagnosis of obesity, a refusal to grant exemption from volunteer service, a refusal to issue a disabled parking permit, and recommendations against surgery and for increased activity. (R. 56). Implicit in this it can be argued is an assessment of obesity and its effect on ability to perform work. This single failure to mention obesity may have resulted in "harmless error." See *Villano v. Astrue*, 556 F.3d 558, 562 (failure to "consider the effect of obesity is subject to harmless-error analysis").

31

But when read in light of the previous errors of the ALJ, it raises serious doubts as to whether the ALJ properly accounted for Ms. Adams' obesity when developing the RFC or the hypothetical questions to the VE. On remand, the ALJ is encouraged to fully explain how Ms. Adams' obesity, in combination with her other limitations, affects, if it does, her ability to work.

## CONCLUSION

The plaintiff's motion of remand is granted.


ENTERED:_____
                  UNITED STATES MAGISTRATE JUDGE


DATE: July 20, 2012

32